David B. Cotner (Bar No. 2386)
DATSOPOULOS, MACDONALD & LIND
201 West Main, Suite 201
Missoula, MT 59802
Tel: 406-728-0810
Fax: 406-543-0134
dcotner@dmllaw.com

Bradley R. Duncan
Hugh R. McCullough
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Tel: 206-622-3150
Fax: 206-757-7700
bradleyduncan@dwt.com
hughmccullough@dwt.com

Attorneys for Richard J. Samson,
Chapter 7 Trustee for Edra D. Blixseth

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>EDRA D. BLIXSETH,<br><br>　　　　Debtor. | Case No. 09-60452 |
| RICHARD J. SAMSON, as Trustee,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ARCHER CAPITAL FUND, L.P. and<br>ARCHER CAPITAL MANAGEMENT, L.P.,<br><br>　　　　Defendants. | Adversary No. _____ |

**COMPLAINT**

## PARTIES

1. Plaintiff Richard J. Samson (the "*Trustee*") is the duly-appointed, qualified, and acting trustee for the chapter 7 bankruptcy estate of Edra D. Blixseth ("*Edra*"). As such, he has the capacity to sue and be sued on behalf of the estate pursuant to section 323 of title 11 of the United States Code (the "*Bankruptcy Code*").

2. Edra was a resident of the state of California at all times material to this lawsuit.

3. Defendant Archer Capital Fund, L.P. ("*Archer Capital Fund*") is a New York limited liability company.

4. Defendant Archer Capital Management, L.P. ("*Archer Capital Management*" and together with Archer Capital Fund, the "*Archer Companies*") is a New York limited liability company.

5. The Archer Companies maintain a business office in the state of California.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 USC §§ 1334 and 1367.

7. This adversary proceeding is a core proceeding pursuant to 11 U.S.C. § 157(b).

8. Venue is proper in this district pursuant to 28 USC § 1409.

9. The acts alleged herein, or material portions thereof, took place in the state of California.

## FACTS RELEVANT TO MULTIPLE COUNTS

**A.  Edra Was Insolvent in 2008 and in Dire Need of Cash.**

10. Edra and her ex-husband, Tim Blixseth (*"Tim"*), separated on or about December 1, 2006. Edra filed a Petition for Dissolution in the Superior Court of California, Riverside

2

County, on December 15, 2006, requesting dissolution of the marriage based on irreconcilable differences.

11. When the Blixseths separated, Edra owned no material property apart from her community interests in various items of community property.

12. Edra stated in sworn testimony that in 2007 that she was required to borrow money to support herself since she had no independent source of cash.

13. On May 30, 2008, Edra declared under penalty of perjury that she was unable to pay her bills as they became due. Edra described her dire financial circumstances as an "emergency." Edra also admitted that she had borrowed over $20 million to pay expenses since her separation from Tim, and that she had "no income with which to repay my debt."

14. Edra was hopelessly insolvent as of June 30, 2008, and at all relevant times thereafter, and had been living off of borrowed money for years. She had no material income-producing assets.

15. Even after Edra acquired assets of her own through the dissolution proceeding, those assets came burdened with substantial debts that rendered her even more deeply insolvent. As a result of her insolvency, Edra desperately needed financing, which the Archer Companies knew or should have known.

        **B.**     **Edra Tries to Borrow Money from the Archer Companies.**

16. To fund her obligations and stave off bankruptcy, Edra sought financing from the Archer Companies. On or around July 30, 2008, Edra and Archer Capital Fund executed a Financing Proposal (the "***Term Sheet***") for a senior secured term loan of $58 million (the "***Loan***").

17. The terms and conditions of the Term Sheet were extraordinarily lopsided against Edra and in favor of the Archer Companies. The Loan was to have carried interest at an

3

adjustable rate of not less than 17 percent, plus certain closing fees (a usurious rate under Montana law).  Although the Term Sheet purported to describe the terms on which the Archer Companies would loan money to Edra, in fact the conditions to funding allowed the Archer Companies to avoid making the Loan, while requiring Edra to pay large fees in exchange for an illusory funding "commitment" from the Archer Companies.

18. For example, the Term Sheet expressly states that it is non-binding, ***except for*** "provisions hereof under the captions 'Expenses,' 'Exclusivity and Break-up Fee,' 'Work Fee,' 'Advisory Fees,' 'Indemnification,' 'Confidentiality,' and 'Governing Law and Jurisdiction' . . . ."  None of the binding provisions required the Archer Companies to actually fund the Loan.  The binding provisions did, however, require Edra to pay fees.

19. The conditions to the loan commitment likewise rendered it purely illusory.  The Term Sheet provides that the closing of the Loan was subject to "various conditions precedent . . . including ***but not limited to***" eleven enumerated conditions.  (Emphasis added.)  The conditions precedent effectively gave the Archer Companies unlimited discretion to deny funding to Edra.  For instance:

(a) the Archer Companies were not required to make the Loan unless the documentation of the loan was "in form and substance satisfactory to [the Archer Companies] . . . "

(b) the Archer Companies were not required to make the Loan unless they were satisfied with "legal and business due diligence"

(c) the Archer Companies were not required to make the Loan unless they were satisfied with "[a]ll agreements relating to the corporate structure of the Borrowers and their affiliates and all organizational documents of such affiliates . . . "; and

4

   (d) the Archer Companies were entitled to decide not to make the Loan in their "sole and absolute discretion".

 20. Based on the conditions imposed on the Loan, the chances of Edra ever receiving any benefit from her transactions with the Archer Companies were negligible.

 21. By contrast, the fees imposed on Edra by the Archer Companies were not conditional (or negligible) and her obligations to pay many of those fees was binding the instant she signed the Term Sheet.  For instance:

   (a) the Term Sheet required Edra to pay all of the Archer Companies' "fees, expenses, and disbursements . . . in connection with the due diligence of this transaction and the preparation, negotiation and execution of this agreement and the definitive loan documents . . . ." Edra in fact paid at least $185,000 of fees, expenses, and disbursements allegedly incurred by the Archer Companies (the "***Negotiation Fee***");

   (b) the Term Sheet required Edra to pay a "non-refundable work fee equal to $250,000."  Edra in fact paid at least $200,000 of this non-refundable fee (the "***Work Fee***");

   (c) the Term Sheet required Edra to pay a break-up fee of $1,500,000 if she consummated certain defined alternative capital raising activities (the "***Break-Up Fee***").  As discussed in more detail below, the Archer Companies foreclosed on four expensive automobiles with an estimated value of not less than $394,856, and some portion of the proceeds may have been applied to the Break-Up Fee or other the fees; and

   (d) if the Archer Companies had actually funded the Loan despite their illusory commitment, Edra would have been required to pay a three percent "***Closing Fee***" of $1,740,000.

22.     To the extent any fee was not immediately paid by Edra when due, the Archer Companies charged interest on the unpaid fees at not less than 17 percent per annum.

23.     Edra was also required to indemnify the Archer Companies against "any and all claims, damages, losses, liabilities and expenses" arising in connection with the Term Sheet and the transactions contemplated thereby.  The Archer Companies did not indemnify Edra for anything.

### C.     The Archer Companies Fail to Make the Loan.

24.     The Archer Companies, however, were not willing or able to fund the Loan, and they never rendered any services to Edra of any material value.

25.     The Archer Companies' unwillingness to fund the Loan is evidenced by, among other things, the fact that the Archer Companies started changing the terms of the deal almost immediately after executing the Term Sheet.  The changes were allegedly based on property valuations conducted by the Archer Companies, among other things.  The Archer Companies' unwillingness to fund the Loan is also evidenced by the fact that the Archer Companies failed to make a timely lending decision even though the Term Sheet contemplated an early closing date.

26.     The Archer Companies may not have had the wherewithal to fund the Loan, even if their promises to do so had not been illusory, and even if the Archer Companies ever intended to fulfill their promises.  The world financial markets experienced signification dislocations in August and September of 2008, when the Archer Companies were supposedly working with Edra in good faith to close the Loan.

27.     As a consequence of the conditional nature of the promises made by the Archer Companies in the Term Sheet, and due to the fact that the Archer Companies did not fund the Loan, Edra derived no benefit whatsoever from her arrangement with the Archer Companies.  In

fact, the arrangement with the Archer Companies harmed Edra by distracting her attention from other lenders and strategic alternatives that might have yielded more value.

28. The Archer Companies failed to fund the Loan through no fault of Edra's.

29. Although the terms and conditions in the Term Sheet rendered illusory any commitment to actually lend money, the Term Sheet also provided that Edra and the Archer Companies "shall each work diligently and in good faith with one another in an effort to promptly close the Loan."

30. As time passed and the Archer Companies continued to avoid funding, they demanded additional collateral to secure Edra's payment of fees and expenses allegedly incurred by them. On or around September 23, 2008, Edra and the Archer Companies entered into a Security Agreement pursuant to which Edra agreed to pledge four expensive automobiles (the "**Pledged Vehicles**") with an aggregate estimated value of not less than $394,856 as security for her payment of the fees and expenses arising under the Term Sheet.

31. The Archer Companies also induced Edra to agree to pay the $1,500,000 Break-up Fee, despite the fact that Edra had not consummated any alternative financing transaction that would trigger the Break-up Fee. The Security Agreement maintains, falsely, that Edra had "consummated a Break-up Fee Transaction" and that the Archer Companies were therefore entitled to receive the $1,500,000 Break-up Fee from Edra.

32. To induce Edra to continue her fruitless negotiations with the Archer Companies, the Archer Companies agreed to "forbear from receiving the Break-Up fee on the condition that the parties continue to have negotiations regarding a separate financing transaction of approximately $38 million." This promise, too, was illusory because the Security Agreement also provided that the Archer Companies, in their "sole and absolute discretion" could terminate

7

negotiations and, on the tenth day following written notice of its decision to terminate negotiations, demand payment of the Break-up Fee from Edra.

33. Like the Term Sheet, the Security Agreement disavowed any binding commitment to actually lend money to Edra. These terms rendered any benefit that Edra might have received under the Security Agreement entirely conditional, and as a consequence, the Security Agreement likewise conferred no material economic benefit on Edra.

34. As discussed above, when Edra entered into the Term Sheet and the Security Agreement, when she paid the Archer Companies' fees, and when the Archer Companies took security interests in the Pledged Vehicles, Edra was insolvent, or was rendered insolvent as a consequence of those transactions.

    **D.    Edra Files a Voluntary Chapter 11 Petition, and Her Case is Subsequently Converted to Chapter 7.**

35. On March 26, 2009, Edra Blixseth commenced with this Court a voluntary chapter 11 case styled *In re Edra D. Blixseth*, No. 09-60452-11. According to her schedules, Edra was deeply insolvent when she filed for bankruptcy. On May 29, 2009, Edra Blixseth's case was converted to chapter 7, and Richard J. Samson was appointed to serve as chapter 7 trustee.

36. The failure of the Archer Companies to fund the Loan prevented Edra from addressing the disastrous financial consequences of her marital settlement with Tim and thus necessitated her bankruptcy filing.

37. On April 1, 2009 (while Edra's bankruptcy was still pending under chapter 11), Archer Capital Fund moved for relief from the automatic stay with respect to the Pledged Vehicles. On May 1, 2009, the Court (Judge Peterson presiding) found that the Pledged Vehicles were not necessary for Edra's chapter 11 reorganization, and therefore granted the motion of

8

Archer Capital Fund. However, the Court expressly noted that "[Edra] retains whatever claims, defenses, and remedies she may have against Archer in a nonbankruptcy forum, including her argument that she does not owe Archer because it failed to fund her loan." Similarly, at a July 14, 2009 hearing before this Court, the Trustee expressly reserved his rights to investigate and pursue claims against the Archer Companies.

38. On July 23, 2009, Archer Capital Fund filed a proof of claim (No. 43-1) in Edra's chapter 7 bankruptcy case. The Archer Capital Fund proof of claim asserts a claim in the total amount of $1,850,953.29, including $394,856 as a secured claim (comprising the value of the Pledged Vehicles).

## COUNT ONE
### Fraudulent Transfers (11 U.S.C. §§ 548 and 550)

39. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

40. In July 2008, Edra incurred substantial obligations pursuant to the Term Sheet, including the Negotiation Fee and the Work Fee. Edra in fact paid at least $185,000 of the Negotiation Fee and $200,000 of the Work Fee to the Archer Companies. In September of 2008, Edra incurred additional obligations under the Security Agreement (specifically including the Break-up Fee), and also pledged the Pledged Vehicles to secure her obligations under the Term Sheet and the Security Agreement. Edra did not receive reasonably equivalent value in exchange for those transfers and obligations because no loan ever closed and Edra otherwise received nothing of value from the Archer Companies.

41. Edra was insolvent at the time that each of those transfers were made and obligations were incurred, or was rendered insolvent as a result of those transfers.

9

42. Edra was engaged in businesses and transactions for which the property remaining with her at the time of the transfers to the Archer Companies, and obligations incurred to the Archer Companies, was unreasonably small capital. Edra participated in a variety of businesses that were insolvent and/or generating little to no cash. Edra was funding losses and personal and business expenses with borrowed money.

43. Edra incurred debts that were beyond her ability to pay as those debts matured. Edra incurred the obligations without any ability to repay those obligations, except through the liquidation of assets or borrowing money.

44. Each obligation incurred by Edra to the Archer Companies, and each transfer made by Edra to any Archer Company, is therefore avoidable pursuant to 11 U.S.C. §§ 548 and 550.

## COUNT TWO
**Fraudulent Transfers**
**(Cal. Civ. Code §§ 3439.04 and 3439.05, NY Debtor and Creditor Law §§ 273, 274, 275, and other comparable state laws, and 11 U.S.C. §§ 544 and 550)**

45. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

46. In July 2008, Edra incurred substantial obligations pursuant to the Term Sheet, including the Negotiation Fee and the Work Fee. Edra in fact paid at least $185,000 of the Negotiation Fee and $200,000 of the Work Fee to the Archer Companies. In September of 2008, Edra incurred additional obligations under the Security Agreement (specifically including the Break-up Fee), and also pledged the Pledged Vehicles to secure her obligations under the Term Sheet and the Security Agreement. Edra did not receive reasonably equivalent value in exchange for those transfers and obligations because no loan ever closed and Edra otherwise received nothing of value from the Archer Companies.

10

47. Edra was insolvent at the time that each of those transfers were made and obligations were incurred, or was rendered insolvent as a result of those transfers.

48. Edra was engaged in businesses and transactions for which the property remaining with her at the time of the transfers to the Archer Companies, and obligations incurred to the Archer Companies, was unreasonably small capital. Edra participated in a variety of businesses that were insolvent and/or generating little to no cash. Edra was funding losses and personal and business expenses with borrowed money.

49. Edra incurred debts that were beyond her ability to pay as those debts matured. Edra incurred the obligations without any ability to repay those obligations, except through the liquidation of assets or borrowing money. Edra was not generally paying her debts as those debts became due.

50. Each obligation incurred by Edra to any Archer Company, and each transfer made by Edra to any Archer Company, is therefore avoidable pursuant to Cal. Civ. Code §§ 3439.04 and 3439.05, Mont. Code §§ 31-2-233 and 31-2-234, New York Debtor and Creditor Law §§ 273, 274, and 275, and other comparable state laws, and 11 U.S.C. §§ 544 and 550.

## COUNT THREE
### Disallowance of Claims (11 U.S.C. §§ 502 and 506)

51. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

52. Each claim of any Archer Company against Edra's estate should be disallowed and expunged because the obligation that forms the basis for those claims is void as a fraudulent transfer.

53. Alternatively, each claim of any Archer Company against Edra's estate should be offset and reduced by the fair value of the assets that any Archer Company has foreclosed upon and any other amounts repaid.

54. Alternatively, each claim of any Archer Company should be offset and reduced by the amount of the Trustee's claims against the Archer Companies.

55. Alternatively, the claims of the Archer Companies for interest and attorneys' fees should be reduced or eliminated to the extent excessive, usurious, or unreasonable.

## COUNT FOUR
### Breach of Contract

56. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

57. In the Term Sheet, both Edra and the Archer Companies promised to "work diligently and in good faith" with each other "in an effort to promptly close the Loan." In reliance upon the Archer Companies' promises, and in exchange for the benefits that she expected from the Loan, Edra incurred substantial obligations pursuant to the Term Sheet and the Security Agreement, including the Negotiation Fee, the Work Fee, and the Break-up Fee.

58. The Archer Companies never made the Loan to Edra or rendered any services to Edra of any material value. The Archer Companies have breached the terms of the Term Sheet and the Security Agreement by failing to work diligently and in good faith with Edra to promptly close the Loan.

59. Edra has been damaged in excess of $750,000. The exact amount of Edra's losses will be determined at trial.

## COUNT FIVE
### Breach of Covenant of Good Faith and Fair Dealing (Common Law)

60. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

61. In the Term Sheet, both Edra and the Archer Companies promised to "work diligently and in good faith" with each other "in an effort to promptly close the Loan." In reliance upon the Archer Companies' promises, and in exchange for the benefits that she expected from the Loan, Edra incurred substantial obligations pursuant to the Term Sheet and the Security Agreement, including the Negotiation Fee, the Work Fee, and the Break-up Fee.

62. An implied covenant of good faith and fair dealing is implied into any contract to ensure that neither party to the contract will do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. This implied covenant not only imposes on each party the duty to refrain from doing anything that would render performance of the contract of the other party impossible, but also the duty to do everything that the contract presupposes the parties will do in order to accomplish the contract's purposes and to ensure that the other party receives the benefit of its bargain.

63. The Archer Companies breached both the express and the implied covenant of good faith and fair dealing in the parties' agreements by failing to work diligently and in good faith with Edra to promptly close the Loan.

64. Edra has been damaged in excess of $750,000. The exact amount of Edra's losses will be determined at trial.

## COUNT SIX
### Breach of Covenant of Good Faith and Fair Dealing
### (UCC § 1-203 and Cal. Com. Code § 1203)

65. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

66. In committing the acts recited above, the Archer Companies deprived Edra of the benefits of the Security Agreement, and thereby, pursuant to UCC § 1-203 (as enacted in various jurisdictions, including Montana and New York) and California Commercial Code § 1203, violated the covenant of good faith and fair dealing implied in the Security Agreement.

67. Edra has been damaged in excess of $750,000. The exact amount of Edra's losses will be determined at trial.

## COUNT SEVEN
### Violation of California's Unfair Competition Law
### (California Business and Professions Code §§ 17200 *et seq*.)

68. The Trustee incorporates in this count each allegation set forth in paragraphs one through 38.

69. In committing the acts recited above, the Archer Companies engaged in unfair conduct as proscribed by the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq. Said acts were committed in the state of California.

70. The acts were unfair in that while Edra paid at least $185,000 of the Negotiation Fee, $200,000 of the Work Fee, and pledged the Pledged Vehicles to the Archer Companies under the Security Agreement, the Archer Companies were either unable or unwilling to fund the Loan (which was never disclosed to Edra), notwithstanding the Archer Companies' promise and obligation to "work diligently and in good faith . . . in an effort to promptly close the Loan." Edra received nothing of value from the Archer Companies.

71. Edra was injured by the Archer Companies' unfair conduct. The harm caused to Edra by the Archer Companies' conduct outweighs any benefits that the conduct may have.

72. Edra has been damaged in excess of $750,000. The exact amount of Edra's losses will be determined at trial.

## DEMAND FOR JUDGMENT

For the foregoing reasons, the Trustee demands, collectively or in the alternative, as justice may require:

(a) that judgment be entered against each Archer Company in an amount equal to the value of the property transferred to that Archer Company, plus costs and attorneys' fees;

(b) that each transfer to any Archer Company, and each obligation to any Archer Company, be avoided and recovered by the estate, with any judgment in favor of the Trustee be secured by a lien on the property transferred;

(c) that each claim of any Archer Company against the estate be disallowed and expunged;

(d) that judgment be entered against each Archer Company for direct, indirect, consequential, and exemplary damages in excess of $750,000, together with costs and attorneys' fees, with the exact amount to be determined at trial; and

(e) such other relief as principles of equity may require.

DATED this 25th day of March, 2011

By: /s/ David B. Cotner
    David B. Cotner
    Bradley R. Duncan
    Hugh R. McCullough
    *Attorneys for Richard J. Samson,*
    *Chapter 7 Trustee for Edra D. Blixseth*